# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN T. HUFF, JR., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 15-cv-00438 (KBJ) |
| | ) |
| TOM VILSACK, *in his official capacity as* Secretary of Agriculture, United States Department of Agriculture, | ) |
| | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

For the past twenty-three months, Plaintiff John T. Huff, who is a private real-estate developer and the General Partner of several business entities that own multi-family housing projects in the state of Alabama, has been seeking permission from the Rural Development ("RD") division of the United States Department of Agriculture to transfer one of his properties—Barbour Creek Apartments ("Barbour Creek")—to a new business entity named Meadow Manor L.P., in order to access Low Income Housing Tax Credits ("LIHTCs") that the Alabama Housing Finance Authority ("AHFA") has awarded. The AHFA granted the valuable tax credits to Meadow Manor in the context of a competitive bidding process, and Meadow Manor proposed to use those credits to generate funds that would enable substantial upgrades to the rental-assistance units in Barbour Creek, which is a residential building that (like many other rural housing projects for low-income families) has become outdated and is in need of substantial

repairs. As part of the application for the LIHTCs, Meadow Manor requested and received a "commitment letter" from RD, which notified the AHFA that RD was "committed to the transfer[.]" (Commitment Letter, Ex. 11 to Pls.' Mot. for Prelim. Inj., ECF No. 15-12, at 2.)[1] But when it came time for RD to approve the transfer officially, the agency determined that the transfer request could not be approved because "the transferee, Meadow Manor, [was] not an eligible borrower" and Barbour Creek Apartments, Ltd. (the Huff entity associated with the Barbour Creek property) was "ineligible for Agency assistance" under the applicable regulations, given that Huff was not in compliance with all regulatory requirements with respect to some of his other properties. (*See* June 24 Denial, Ex. 2 to Pls.' Emergency Mot. for Summ. J., ECF No. 102-4.)

This letter denying Huff's transfer application, which RD issued on June 24, 2015—after withdrawing a previous denial decision and thereby mooting a scheduled administrative review hearing—prompted two responses by Huff and his associates: first, they launched an administrative appeal (*see* Director Determination, Ex. 9 to Pls.' Emergency Mot. for Summ. J., ECF No. 102-11, at 3), and second, they filed a motion for a preliminary injunction in the instant lawsuit, claiming that "[t]he Agency's decision to reverse course and renege on its commitment to approve the transfer of Barbour Creek to Meadow Manor was arbitrary, capricious, an abuse of discretion, and contrary to law." (Pls.' Mot. for Prelim. Inj. ("Pls.' Prelim. Inj. Mot."), ECF No. 15, at 1). From this Court's perspective, RD's June 24th transfer-denial letter was also the

---

[1] Page-number citations to documents the parties have filed refer to the page numbers that the Court's electronic filing system assigns.

beginning of a lengthy saga that has included earnest claims of urgency and irreparable harm, an improvident request for a transfer of the case to a federal district court that lacked the resources to accept it, threshold concerns regarding exhaustion of administrative remedies, and two failed attempts at settlement—all of which has made resolution of this matter alarmingly elusive and troubling from the standpoint of all concerned.

Significantly for present purposes, on January 13, 2016, a Hearing Officer of the National Appeals Division of the Department of Agriculture ("the NAD") finally reached the merits of Plaintiffs' contention that RD had erred with respect to its transfer decision. (*See* Appeal Determination ("Hearing Officer Determination"), Ex. 8 to Pls.' Emergency Mot. for Summ. J., ECF No. 102-10, at 3, 7.) The Hearing Officer agreed with Plaintiffs, finding "that the Agency's decision was in error" (*see id.* at 3), and when the agency requested that the NAD Director review the Hearing Officer's determination, the NAD Director, too, concluded that "RD erred when it denied [the] request to transfer to Meadow Manor" (*see* Director Determination at 3). At that point, federal statutes and regulations required RD to "implement" the NAD decision, 7 U.S.C. § 7000(a), and, on May 4, 2016, the agency issued a decision purporting to do so (*see* Implementation, Ex. 1 to Pls.' Emergency Mot. for Summ. J., ECF No. 102-3, at 2).

Before this Court at present are two motions related to the agency's purported implementation: (1) Plaintiffs' "emergency" motion for summary judgment—which contends that, when the agency issued an implementation letter that denied the transfer request yet again, it relied on the same improper bases that the NAD had already

considered and rejected, and therefore plainly failed to satisfy the implementation objective (*see* Pls.' Emergency Mot. for Summ. J. ("Pls.' Mot."), ECF No. 102; Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem."), ECF No. 102-1, at 8)—and (2) the agency's cross-motion for summary judgment, which asserts that RD's implementation of the NAD's adverse decision is now complete and that this Court should enter judgment in its favor with respect to the Plaintiffs' claim that the denial of the Barbour Creek transfer was arbitrary and capricious and thus violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06 (*see* Def.'s Opp'n to Pls.' Mot. & Def.'s Cross-Mot. for Summ. J. ("Def.'s Mem."), ECF No. 105, at 5–6.)

For the reasons explained below, this Court concludes that RD has acted arbitrarily and capriciously with respect to its implementation determination, and as a result, Plaintiffs are entitled to summary judgment on their Barbour Creek transfer claim. The Court reaches this conclusion because, after RD's purportedly de novo review of Plaintiffs' transfer application in light of the NAD determinations, RD has denied the transfer application *on the same grounds* that the NAD previously deemed inconsistent with the facts and applicable regulations, and thus cannot be said to have implemented the NAD's decision in any meaningful sense. Moreover, because the agency's own course of action with respect to reviewing the transfer request indicates that only one rational option (to approve the transfer) remains open to the agency if this matter is remanded back to it as a result of this Court's ruling, this Court will not send the matter to the agency for further consideration; instead, it will avoid further needless delay by ordering the agency to approve the transfer application within thirty days.

# I.     BACKGROUND

This case has a long and tortuous history that relates to a lengthy business relationship that Plaintiff John T. Huff has had with the U.S. Department of Agriculture ("USDA") in the state of Alabama.  (*See generally* Am. Compl. ("Compl."), ECF No. 7.)[2]  According to the facts set forth in the record, Huff has long owned or been involved with many "multi-family housing properties" in rural areas of the state (Director Determination at 4), and he finances these projects via federal loans that are issued pursuant to the Housing Act of 1949, 42 U.S.C. § 1471 *et seq.*  The Housing Act promotes the "realization . . . of the goal of a decent home and a suitable living environment for every American family[,]" *Pealo v. Farmers Home Admin. of U.S. Dep't of Agric.*, 562 F.2d 744, 745 (D.C. Cir. 1977) (citation omitted), and as relevant here, the Act authorizes the USDA to administer a loan-financing scheme with respect to certain privately owned residential properties.  Specifically, under section 515 of the Housing Act, the Secretary of Agriculture is permitted to "make loans to private nonprofit corporations and consumer cooperatives to provide housing and related facilities for . . . families of low income in rural areas."  *Id.* at 746; *see also* 42 U.S.C. § 1485(a).  The Rural Housing Service section of the USDA's RD division (referred to hereinafter as "RD") administers this loan program through its local offices nationwide. 7 C.F.R. § 2003.18(b)(4).[3]

---

[2] Plaintiffs have twice supplemented their amended complaint pursuant to Federal Rule of Civil Procedure 15.  In this Memorandum Opinion, the Court cites solely to the Amended Complaint (*see generally* Compl.) and the Second Supplemental Complaint (*see* Second Suppl. Compl., ECF No. 118).

[3] Like the parties, the Court refers throughout this opinion simply to RD, although the Rural Housing Service takes the lead in administering the program.

## A.      Transfer Requests Regarding Section 515 Properties

The narrow issue presently before this Court involves a Section 515-financed property in Alabama known as the Barbour Creek Apartments.  (*See* Compl. ¶ 68.)  That property is owned by Plaintiff Barbour Creek Apartments, Ltd. (hereinafter "BCA Ltd"), which has Plaintiff John Huff as its General Partner (*see id.* ¶¶ 19–22), and in that regard, is like the other limited partnership Plaintiffs in this action (*see id.*).  In 2014, BCA Ltd—acting through Huff—asked RD for permission to transfer ownership of Barbour Creek Apartments to Meadow Manor L.P., an entity that was formed at least in part to facilitate the receipt and renovation of the Barbour Creek Property.  (*See* Pls.' Mem. in Supp. of Pls.' Prelim. Inj. Mot. ("Pls.' Prelim. Inj. Mem."), ECF No. 15-1, at 19.)  The statute expressly provides for such transfers, *see* 42 U.S.C. § 1485(h), and the undisputed impetus for Huff's transfer request was his desire to gain access to LIHTCs and the funds that LIHTCs generate.

The specifics of the LIHTC system are not material to the instant dispute; in general terms, the regime involves the coordinated efforts of the Federal government, State governments, and for-profit entities to provide affordable housing by making federal tax credits available (via distribution to state housing agencies) to for-profit entities that invest in the development or rehabilitation of certain types of housing projects.  *See* Adam McNeely, *Improving Low Income Housing: Eliminating the Conflict Between Property Taxes and the LIHTC Program*, 15 J. Affordable Housing & Community Dev. L. 324, 325–26 (2006); *see also Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2513 (2015) (describing the program and observing that "Federal law . . . favors the distribution of these tax credits for the development of housing units in low-income areas").  Once the LIHTCs are accessed,

they can be sold to investors, and the proceeds used to upgrade and maintain the low-income housing that was the basis for the issuance of the credits. *See id.* at 325, 328. Here, everyone agrees that Huff and his management company (Huff Management) periodically transfer Huff-owned properties to "newly created business entities in order to qualify those properties for LIHTC funding[,]" and that one such desired transfer was the transfer of Barbour Creek Apartments to Meadow Manor, L.P. (Pls.' Prelim. Inj. Mem. at 18; *see also* Director Determination at 4.)

Notably, a Section 515 property cannot be transferred without the approval of the USDA (through RD), and federal law mandates a host of prerequisites before RD can approve such a transfer. By statute, "the ownership or control" of Section 515 properties "may be transferred only if the Secretary determines that such transfer would further the provision of housing and related facilities for low-income families or persons and would be in the best interests of residents and the Federal Government." 42 U.S.C. § 1485(h)(1). In addition, federal regulations lay out the preconditions to the agency's approval of such a transfer in granular detail. *See, e.g.*, 7 C.F.R. § 3560.406. The bird's-eye view is that consent is granted only if the transfer is "in the best interest of the Federal Government," 7 C.F.R. § 3560.406(b), and the transferee—*i.e.*, the applicant[4]—must show it is an "eligible borrower" insofar as it meets a host of regulatory requirements, 7 C.F.R. § 3560.406(d)(1).

Two of these applicant-eligibility criteria are relevant here. First, the applicant must "[b]e able to maintain, manage, and operate the housing for its intended purpose and in accordance with all Agency requirements[.]" *Id.* § 3560.55(a)(4) (referred to

---

[4] An "applicant" is the individual or other entity "that will be the owner of the project for which an application for funding from the Agency is submitted." 7 C.F.R. § 3560.11.

herein as "subsection (a)(4)"). Second, if "an applicant or the managing general partner of a borrower, as well as any affiliated entity having a 10 percent or more ownership interest[] has a prior or existing Agency debt," *id.* § 3560.55(b), additional eligibility requirements apply. In this circumstance, among other things, "[t]he applicant must be in compliance with any existing loan or grant agreements and with all legal and regulatory requirements or must have an Agency-approved workout agreement and be in compliance with the provisions of the workout agreement." *Id.* § 3560.55(b)(1) (shorthanded herein as "subsection (b)(1)"); *see also id.* (authorizing USDA to require that applicants with "monetary or non-monetary deficiencies be in compliance" with a workout agreement for six or more months to be eligible). *Id.* The entirety of section 3560.55 is reproduced in the Appendix to this Memorandum Opinion and Order; notably, the subsection (a)(4) requirement and the subsection (b)(1) requirements are but two of a host of criteria that an applicant must (or in the case of subsection (b)(1), might have to) satisfy in order for the applicant to be deemed an "eligible borrower" for the purpose of 7 C.F.R. § 3560.406(d)(1). *See* 7 C.F.R. § 3560.406(d)(1) (stating that the "transferee or buyer must be an eligible borrower under the requirements established by [7 C.F.R. §§ 3560.51–74]").

When Huff sought permission to transfer Barbour Creek to Meadow Manor in July of 2014, RD concluded that Meadow Manor was not an eligible borrower, and that Barbour Creek was not eligible for further assistance. It thus refused to approve the transfer, as mentioned above and described in detail below. It was that agency action that prompted Huff not only to file a preliminary injunction in this Court, but also to

embark on an ultimately successful journey to seek relief from the USDA's specialized administrative appeal process.[5]

## B.     The USDA's National Appeals Division

Congress established administrative procedures to address complaints about "adverse decision[s][,]" 7 U.S.C. § 6991(1), of the USDA related to agency-administered programs in 1994, pursuant to the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act, 7 U.S.C. § 6901 *et seq.* The National Appeals Division ("NAD"), which was established as a department within the USDA, was part of that endeavor. *See id.* §§ 6991(6), 6992(a). Notably, the NAD is independent from all other parts of the USDA, *see* 7 C.F.R. § 11.2, and among its tasks, the NAD handles complaints related to RD's administration of the Section 515 program, *id.* § 11.1; *see also id.* § 11.3. For present purposes, all parties agree that the denial of the transfer application at issue here was the "[d]enial of participation in, or receipt of benefits under, any program of an agency[,]" *id.* § 11.3(a)(1), and thus was an RD decision that was adverse to Plaintiffs. NAD regulations require the agency to provide Section 515 participants with written notice of an adverse decision and of the right to a NAD hearing, *see* 7 C.F.R. § 3565.14, and the initial step of the administrative review

---

[5] At the time that Plaintiffs filed their preliminary injunction motion regarding RD's Barbour Creek decision, a related civil action was already pending in this Court, pursuant to which Plaintiffs claimed that RD had violated the APA with respect to *other* arbitrary and capricious decisions involving Huff-owned properties. (*See* Compl. ¶¶ 107–119.) After the transfer denial, Huff filed a preliminary injunction motion related to the Barbour Creek matter in the context of the existing lawsuit, and this Court granted him leave to supplement the complaint to include claims related to the denial. (*See* Minute Order of January 4, 2016 Granting Leave to File Suppl. Compl.) This Court ultimately denied Huff's preliminary injunction motion on the grounds that—due to the ongoing administrative appellate process—there was no final agency action as required by the APA. (*See* Order, ECF No. 59.) Notwithstanding the course of events related to the instant transfer dispute, Plaintiffs' other APA claims against the USDA remain pending.

process is for participants like Huff to "seek review of an adverse decision before a Hearing Officer[,]" *id.* § 11.2(b); *see also id.* § 3560.9.

Aggrieved participants present the Hearing Officer with any sort of evidence they believe aids their cause, such as written briefs and oral presentations, *see* 7 C.F.R. § 11.8(c), and the Hearing Officer reviews those presentations "without regard to whether the evidence was known . . . at the time the adverse decision was made[,]" *id.* § 11.8(c)(5)(ii), in order to determine whether the participants can prove that the "adverse decision of the agency was erroneous by a preponderance of the evidence[,]" *id.* § 11.8(e). And when the Hearing Officer rules, his or her decision becomes the "final determination" of the NAD, unless either side files an appeal to the NAD Director. 7 U.S.C. § 6997(d); *see also Care Net Pregnancy Ctr. of Windham Cty. v. USDA*, 896 F. Supp. 2d 98, 103 (D.D.C. 2012) (explaining that seeking Director review is optional).

If a party seeks review of a Hearing Officer's decision, the Director (or his or her authorized designee) reviews the Hearing Officer's determination, "using the agency record, the hearing record, the request for [Director] review," any responses to the request for Director review, and any other arguments he or she chooses to accept. 7 C.F.R. § 11.9(d).[6] The Director's task is "to determine whether the decision of the Hearing Officer is supported by substantial evidence[,]" and to either "uphold[,] reverse[,] or modif[y]" the Hearing Officer's determination. *Id.* In any case, the Director's determination is the NAD's final determination, unless a party files a request

---

[6] The agency record consists of "all the materials maintained by an agency related to an adverse decision [that] are submitted to the Division by an agency for consideration in connection with an appeal[,]" and the hearing record constitutes "all documents, evidence, and other materials generated in relation to a hearing[.]" 7 C.F.R. § 11.1.

for reconsideration that convinces the Director to reverse or modify the decision, in which case that "decision on reconsideration" is the NAD's final determination. *Id.* § 11.11(c).

However one gets there, a trek through the administrative appeals process eventually yields a final determination by the NAD. The crux of the instant dispute lies in what happens next: by statute, "[o]n the return of a case to an agency pursuant to the final determination of the Division, the head of the agency shall *implement* the final determination not later than 30 days after the effective date of the notice of the final determination." 7 U.S.C. § 7000(a) (emphasis added). Furthermore, "[a] final determination of the [NAD] shall be . . . enforceable by any United States district court of competent jurisdiction in accordance with" the APA. *Id.* § 6999. Pursuant to that mandate, district courts have authority to review an agency's purported implementation in order to ensure that the agency has acted in accordance with the APA in effectuating the determination of the NAD. *See, e.g.*, *Enter. Nat'l Bank v. Johanns*, 539 F. Supp. 2d 343, 346–47 (D.D.C. 2008).

## C.     Facts And Procedural History

The history of the instant case need not be recounted in detail in order to provide an adequate explanation of this Court's decision regarding the pertinent issues. Briefly: as foregrounded above, RD first denied Huff's request for the Barbour Creek transfer on December 16, 2014, and then reaffirmed that denial despite Huff's plea for reconsideration on March 4, 2015. (*See* March 4 Denial Letter, Ex. 15 to Pls.' Prelim. Inj. Mot., ECF No. 15-16, at 2–3). Citing administrative error, the agency withdrew that initial denial letter on May 19, 2015 (*see* Letter Notifying Hearing Officer of Voluntary Withdrawal, Ex. 11 to Compl., ECF No. 6-14, at 3)—just 8 days prior to a

NAD review hearing that Huff had secured on the matter (*see* NAD Notice of Cancellation of Hearing, Ex. 19 to Pls.' Prelim. Inj. Mot., ECF No. 15-19, at 2)—and ostensibly after another review, RD re-issued a denial decision letter on June 24, 2015 (*see* June 24 Denial at 2). Huff properly appealed the June 24th denial decision to a NAD Hearing Officer, who ruled in his favor, stating that "the Agency's decision was in error." (Hearing Officer Determination at 3.) RD appealed that decision to the NAD Director, who reviewed the Hearing Officer's conclusion and upheld it, finding it to be supported by substantial evidence. (*See* Director Determination at 3 (concurring with the Hearing Officer's conclusion that "RD erred when it denied [the] request to transfer to Meadow Manor").)[7] Finally, when RD requested that the Director reconsider his decision upholding the Hearing Officer's determination, the Director denied that request. (*See* Director Letter Denying Reconsideration ("Reconsideration Denial"), Ex. 4 to Def.'s Opp'n & Cross-Mot., ECF No. 105-2, 34–38, at 37.)

On May 4, 2016—a mere 13 days after the Director rejected the agency's reconsideration request—RD issued a decision that purported to "implement[]" the NAD's final determination. (Implementation at 2.) RD's implementation letter explained that RD had "performed another review of the Transfer Application, with consideration given to the additional or new materials" that Plaintiffs had submitted, and stated that, "[a]fter careful consideration, the Transfer Application is denied because the Transferee, Meadow Manor, is ineligible." (*Id.* at 3 (footnote omitted).) The letter pointed out that "RD may deny a transfer request at any point[,]" and that "[g]rounds for denial include, without limitation, Transferee ineligibility." (*Id.*

---

[7] Technically, the Director's authorized designee issued this decision. *See* 7 C.F.R. § 11.1. For simplicity, the Court refers to the Director throughout this Memorandum Opinion.

(footnote omitted).)  It then proceeded to lay out "the reasons for [its] decision." (*Id.* (footnote omitted).)

Because resolution of the present dispute turns on the precise contours of what each authority within the agency decided, the Court has parsed each decision in detail below.  (*See infra* Part III.A.)  It suffices to say here that Plaintiffs filed the instant "emergency" motion for summary judgment on May 19, 2016, and in that motion, Plaintiffs contend that RD has failed to implement the NAD's determination insofar as the agency persisted in purporting to deny the transfer application on the very same grounds that the NAD considered and rejected.  (*See generally* Pls.' Mot.; *see also* Second Suppl. Compl., ECF No. 118, ¶¶ 79.2–79.13 (assailing RD's implementation).)  Defendant has opposed Plaintiff's motion, filing a brief that it has styled as an opposition and "cross-motion" for summary judgment, and arguing that its implementation is in accordance with both the APA and the scope of the NAD's decision.  (*See generally* Def.'s Mem.)  Because neither party's motion resolves all of the claims in this case, both motions have been construed as motions for partial summary judgment insofar as a grant of summary judgment would result only in the entry of judgment with respect to the APA claim related to the Barbour Creek transfer.  This Court held a hearing on the cross-motions on June 2, 2016.

## II.    LEGAL STANDARD

The APA's longstanding "arbitrary and capricious" standard applies to this Court's consideration of whether the USDA has properly implemented a final determination of the NAD.  *See Enter. Nat'l Bank*, 539 F. Supp. 2d at 346–47; *cf. Enter. Nat'l Bank v. Vilsack*, 568 F.3d 229, 235 (D.C. Cir. 2009) (noting that the district court

below correctly concluded that the USDA's implementation "was neither arbitrary nor capricious" (citation omitted)). Of course, this standard is "very deferential[,]" and "forbids a court from substitut[ing] its judgment for that of the agency." *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016) (second alteration in original) (internal quotation marks and citation omitted). However, the required deference does not countenance "rubber stamp[ing] agency actions[.]" *Nat'l Parks Conservation Ass'n v. Jewell*, 965 F. Supp. 2d 67, 74 (D.D.C. 2013) (internal quotation marks and citation omitted). To the contrary, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking[,]" which means the court *must* ensure that the "decision was based on a consideration of the relevant factors and [determine] whether there has been a clear error of judgment." *Judulang v. Holder*, 132 S. Ct. 476, 483–84 (2011) (internal quotation marks omitted) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Thus, courts do not (and cannot) "defer to the agency's conclusory or unsupported suppositions." *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 47 (D.D.C. 2012) (internal quotation marks omitted) (quoting *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1186–87 (D.C. Cir. 2004)).

Although the parties here have invoked this Court's review through the filing of cross-motions for summary judgment, in cases "involving review of a final agency action[,] . . . the standard set forth in [Federal Rule of Civil Procedure 56] does not apply because of the limited role of a court in reviewing the administrative record." *ViroPharma, Inc. v. Hamburg*, 916 F. Supp. 2d 76, 79 (D.D.C. 2013) (internal quotation marks omitted) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C.

2006)).  That is, rather than an evaluation of the presence of a genuine issue of material fact for trial, the judicial function in administrative-law cases is "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Id.* (internal quotation marks and citation omitted).  In this role, the district court "sits as an appellate tribunal."  *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (internal quotation marks and citation omitted).

## III.   ANALYSIS

The parameters of the instant dispute are straightforward: Plaintiffs insist that RD has failed to implement the decision of the NAD regarding RD's erroneous denial of the Barbour Creek transfer, while RD maintains that implementation has occurred and that, in accordance with the agency's reasoned implementation decision, the transfer still cannot be approved.  As explained fully below, this Court concludes that the NAD indisputably rejected the reasons for denying the transfer that RD put forward in its June 24th denial letter, and yet RD has reasserted precisely those same reasons as the basis for denying the transfer again, in the context of its "implementation" letter.  Thus, the Court finds that RD's response to the NAD's decision is arbitrary and capricious, and as a result, Plaintiffs are entitled to judgment with respect to their implementation claim.  What is more, this Court agrees with Plaintiffs' assertion that the only conclusion that reasonably can be drawn from the fact that RD's "careful consideration" of the complete transfer application upon remand (Implementation at 3) yielded only reasons for denying the transfer that the NAD determination already had foreclosed is that no other legitimate reasons for denial exist under the applicable

regulations. Accordingly, this Court will grant Plaintiffs' (partial) motion for summary judgment, will deny Defendants' (partial) cross-motion for summary judgment, and will order RD to approve the transfer application within 30 days.

**A.    When It Ruled In Huff's Favor, The NAD Rejected As Irrelevant The Link That RD Drew Between The Allegedly Mismanaged Huff Properties And Meadow Manor's Ability To Maintain, Manage, And Operate Barbour Creek**

Determining whether RD failed to implement the NAD's decision, as Plaintiffs assert, requires a detailed examination of the decisions that each of the agency divisions (RD and the NAD) rendered at each stage of the administrative process with respect the transfer request at issue here.

### 1.    The June 24th Letter

As explained, RD stated its reasons for denying the transfer application in its letter of June 24, 2015, which is addressed to "John T. Huff" as "General Partner" of BCA Ltd. (*See* June 24 Denial at 2.) RD's June 24th decision letter has three subsections, the headings of which helpfully illuminate the agency's analysis. Section one is titled "**Meadow Manor is not able to maintain, manage, and operate the housing in accordance with all Agency Requirements**" (*id.* at 3); section two bears the heading "**Barbour Creek is ineligible for further assistance**" (*id.* at 6); and section three purports to explain Huff's "**Right to Appeal**" (*id.* at 7). As a preface to the discussion that appears in each of these sections, the agency states its multifaceted conclusions regarding the transfer request, which is quoted here in full:

> The Agency has determined that the proposed transferee, Meadow Manor, L.P. (hereafter "Meadow Manor") will not be able to maintain, manage and operate the housing in accordance with all Agency requirements. 7 C.F.R. § 3560.55(a)(4). In addition, you, as the General Partner of Barbour Creek Apartments, Ltd. (hereafter "Barbour Creek"), are not in compliance with all legal and regulatory requirements. 7 C.F.R. § 3560.55(b)(1).

> Therefore, the Agency has determined that Meadow Manor and Barbour Creek are ineligible for Agency assistance. 7 C.F.R. § 3560.55. The Application cannot be approved because the transferee, Meadow Manor, is not an eligible borrower. 7 C.F.R. § 3560.406(d)(1). Additionally, it is not in the best interest of the Federal Government to approve the transfer described in the Application.

(June 24 Denial at 2.) Thus, RD's decision letter provides five prefatory conclusions that, in its view, support denial of the transfer: (1) that Meadow Manor could not maintain, manage, and operate the housing in accordance with all Agency requirements (as subsection (a)(4) requires); (2) that Huff, as the General Partner of BCA Ltd, was not in compliance with all legal and regulatory requirements (as RD apparently believed subsection (b)(1) required here); (3) that Meadow Manor (because it failed subsection (a)(4)) and Barbour Creek (because it failed subsection (b)(1) through Huff) were ineligible for agency assistance; (4) that Meadow Manor is not an eligible borrower (for the purpose of section 3560.406(d)(1)); and (5) that the transfer was not in the government's best interest. (*See* June 24 Denial at 2.) The June 24th letter then states, definitively, that "[w]e are unable to approve your request for a transfer[,]" and also indicates that the three sections that follow will explain "[t]he reasons for this decision[.]" (*Id.*)

Under the heading that reads "Meadow Manor is not able to maintain, manage, and operate the housing in accordance with all Agency requirements[,]" RD first notes that Huff is "the Limited Partner of Meadow Manor and ha[s] a 95 percent interest in that partnership." (*Id.* at 3.) In addition, RD observes that "[y]ou [Huff] (or business entities under your control) also have an ownership interest or are otherwise involved with the maintenance, management, and/or operation of 35 Agency-financed, multi-family housing properties in Alabama[,]" several of which, RD states, were not being

operated in accordance with agency requirements. (*Id.*) RD then proceeds to list the "deficiencies" that it has noted with respect to 15 Huff-owned properties, including Barbour Creek; one key failure RD consistently references is the persistent underfunding of "reserve accounts." (*See id.* at 3–6.)[8] And, importantly, RD's denial letter offers *only* this "[non-]exhaustive list" of "incidences of non-compliance with Federal regulations and other applicable law" with respect to various Huff-owned properties to support its conclusion that "Meadow Manor will not be able to maintain, manage and operate the housing in accordance with all Agency requirements." (*Id.* at 3.)

The agency's conclusions regarding the ineligibility of BCA Ltd—the entity from which Barbour Creek Apartments would be transferred—appear under the next heading, which reads "Barbour Creek is ineligible for further assistance[.]" (*Id.* at 6.) In a single paragraph, RD declares that BCA Ltd is not eligible to transfer Barbour Creek because "[t]he Agency requires applicants with non-monetary deficiencies to be in compliance with an Agency-approved workout agreement" (*id.* at 6 (citing 7 C.F.R.

---

[8] Reserve accounts are financial accounts that borrowers must "establish and maintain" to "meet the major capital expense needs of a housing project[.]" 7 C.F.R. § 3560.306(a). With respect to the "reserve account" deficiencies that are referenced in the June 24th letter, RD does not provide specifics related to amounts or balances; instead, it states in a conclusory fashion that "there is an insufficient balance in the reserve account" for the particular property described. (*See, e.g.*, June 24 Denial at 3.) Similar conclusory statements appear with respect to alleged deficiencies of other types. For example, item number two on the agency's list of Huff's deficient properties is "Andalusia Estates, Ltd." (*Id.* at 3.) With respect to that property, the June 24th letter states:

> You are the General Partner of Andalusia Estates, Ltd. This complex is not currently being maintained, managed and operated in accordance with all Agency requirements and has been non-compliant for several years. For example, there is an insufficient balance in the reserve account. 7 C.F.R. § 3560.306. For more than 15 years, the complex has operated with special note rents, which are supposed to be only temporary solutions. 7 C.F.R. §§ 3560.452; 3560.454. The housing project is not decent, safe and/or sanitary. 7 C.F.R § 3560.103.

(*Id.*)

§ 3650.55(b)(1)), and Huff, "as the managing general partner" of BCA Ltd, was "not in compliance with all legal and regulatory requirements" (*id.*).  In support of that contention, RD's letter points to the deficiencies "discussed above" (in the first section of the letter) with respect to Barbour Creek Apartments and other Huff-owned properties in Alabama.  (*See id.* (citing 7 C.F.R. § 3560.55(b)(1)).

The third section of RD's June 24th decision letter contains standard boilerplate language (complete with an attached notice) regarding Huff's right to appeal RD's determination.  (*See id.* at 7–10.)  The letter concludes after this recitation of rights, without providing any explanation for the agency's bald initial contention that the proposed transfer was not in the government's best interest.

### 2. The Hearing Officer's Rejection Of The June 24th Letter's Reasoning

As explained, Huff opted to appeal RD's June 24th denial (acting through BCA Ltd), and per the applicable regulations, received an appointment with a NAD Hearing Officer.  At the scheduled hearing, which convened on September 28, 2015, agency counsel unexpectedly filed a "Notice of Absence"—without prior notice to Huff or the Hearing Officer—and declared, in person, that counsel would not attend or participate in the hearing, despite having attended a hearing involving the same parties immediately prior to the scheduled session.  (Hearing Officer Determination at 2 & n.1.)  Consequently, the Hearing Officer "dr[e]w an adverse inference regarding any testimony (and the credibility of said testimony) that would have been obtained from any Agency witness that would have testified from [Huff's] witness list[.]"  (*Id.* at 3.)[9]

---

[9] According to the NAD Director, "RD was [supposed] to appear at the hearing with at least seven witnesses in support of its position[,]" but no one appeared, and no explanation for their absence was provided.  (Director Determination at 5 n.3.)

The Hearing Officer then proceeded to consider the merits of the appeal, without participation by the agency.

The Hearing Officer's written opinion with respect to Huff's appeal begins with a statement of the questions to be decided: (1) whether RD "correctly determine[d] that Meadow Manor . . . is not an eligible borrower"; (2) whether it "correctly determine[d] that the transfer [was] not in the best interest of the Federal Government"; and (3) whether Huff's "further arguments show[ed] Agency error[.]" (*Id.* at 3.)  The Hearing Officer summarizes RD's primary determination regarding the decision on review, as being that Meadow Manor could not satisfy 7 C.F.R. § 3560.406(d)(1), which is a provision that, as described above, necessitates satisfaction of a number of other requirements, including subsection (a)(4)'s maintain/manage/operate requirement.  (*See id.* at 5.)  The Hearing Officer also notes that RD's June 24th letter reached conclusions about the transfer based on an application of subsection (b)(1)'s requirements with respect to BCA Ltd.  (*See id.*)

The Hearing Officer answered the question of whether "the Agency correctly determine[d] that Meadow Manor, L.P., is not an eligible borrower" (*id.* at 3) in the negative.  His analysis begins with the observation that 7 C.F.R. § 3560.406(d)(1) directs the reader to the eligibility requirements found in 7 C.F.R. § 3560.55, and that the eligibility requirements in that section apply only to *applicants*, and with respect to subsection (b)(1), only under certain enumerated conditions.  (*See id.* at 6 ("To be an eligible borrower, *a transferee* or buyer must meet application eligibility requirements." (emphasis added)).)  Thus, in the Hearing Officer's opinion, RD had erred in "focus[ing] on the status and eligibility of *the current owner/transf[eror]*" (*id.*

(emphasis added))—that is, BCA Ltd.  The decision emphasizes that, under the correct reading of the regulations, "the applicant/transferee is Meadow Manor, L.P." and thus, in contrast to the reasoning that RD had put forward, "the appropriate analysis is that of Meadow Manor L.P.'s eligibility" and not that of the current owner, BCA Ltd.  (*Id.*)

Additionally, the Hearing Officer's opinion states that RD had also erred in applying the additional requirements of subsection (b)(1)—which apply only to applicants with debt—to the circumstances presented by this proposed transfer.  In the Hearing Officer's view, "[a]ny evaluation of [BCA Ltd] under 7 C.F.R. § 3560.55(b)(1) is a misapplication of the regulations because [BCA Ltd] is not the applicant[.]"  (*Id.*) Moreover, even if those extra requirements could have had some relevance to the evaluation of *Meadow Manor* (*e.g.*, if Huff had a greater than 10% interest in Meadow Manor, *see* 7 C.F.R. § 3560.55(b)), RD had incorrectly calculated Huff's ownership interest in Meadow Manor as being more than 95%, when, in reality, his ownership interest was far less than 10%, and "the transfer application [made] clear that the syndicator/investor [not Huff] will be the Limited Partner with a 95% ownership interest in Meadow Manor L.P."  (*Id.*)  "As such," the Hearing Officer concludes, "any analysis regarding John T. Huff, Jr., as a limited partner is irrelevant[,]" and "the grounds for [RD's] decision are inapplicable"; therefore, RD "incorrectly determined that Meadow Manor, L.P., is not an eligible borrower."  (*Id.*)

The remainder of the Hearing Officer's opinion faults RD for failing "to provide any further argument or evidence in support of its position" that the transfer was not in the Federal Government's best interest, which resulted in the Hearing Officer having "insufficient evidence in the record" upon which to decide if RD's determination was

correct.  (*Id.* at 6–7.)  The Hearing Officer also states that, insofar as his discussion suffices to demonstrate that the "facts and the regulations [did] not support the Agency's determination that Meadow Manor, L.P., is not an eligible borrower[,]" any other arguments that Huff had put forward related to this matter, such as the contention that RD erred in denying the transfer because it had "recently approved similar transfers of other properties under the same management company[,]" were not being considered. (*Id.* at 7.)

### 3.    The NAD Director's Decision

RD elected to appeal the Hearing Officer's decision to the NAD Director, and on April 11, 2016, the NAD Director (acting through a Deputy Director) issued a written opinion that agreed with the Hearing Officer's conclusion that "RD erred when it denied [the] request to transfer to Meadow Manor."  (Director Determination at 3.)

At the outset, the Director explains that, in order to determine whether the Hearing Officer's decision was supported by substantial evidence, he needed to decide "whether RD's determination that Meadow Manor is not an eligible borrower and [that] the transfer . . . is not in the best interest of the United States Government is in accordance with [governing regulations]."  (Director Determination at 4.)  Importantly, the Director summarizes RD's denial this way: "RD rejected the transfer application because it determined that Meadow Manor [was] not an eligible borrower as specified by 7 C.F.R. § 3560.40[6](d)(1) and [Huff], also the general partner of [BCA Ltd], was not in compliance with . . . 7 C.F.R. § 3560.55(b)(1)."  (*Id.* at 5.)  Furthermore, he said, "RD also determined" that Huff was a limited partner of Meadow Manor "with a 95 percent interest, and therefore Meadow Manor has an existing agency debt and would not be able to maintain, manage, and operate the housing projects in accordance with

RD's requirements." (*Id.*) Finally, according to the Director, RD had asserted that it was not in the government's best interest to approve the transfer. (*See id.*)

Having stated the issues on review, the Director then proceeds to consider—and reject—several discrete arguments that the agency made in its review petition regarding the allegedly erroneous nature of the Hearing Officer's decision. One such argument was RD's contention that, by (allegedly) homing in on subsection (b)(1), the Hearing Officer had failed to address the *true* basis for its denial of the transfer, which, RD argued, was its determination that Meadow Manor would be unable to satisfy subsection (a)(4)'s requirement that the applicant be able to maintain, manage, and operate the housing in accordance with agency requirements. (*See* Agency Request for Director Review, Ex. 3 to Pls.' Mot., ECF No. 102-5, at 8 ("The Agency determined that Meadow Manor was ineligible under 7 C.F.R. § 3560.55(a), not 7 C.F.R. § 3560.55(b)." (emphasis omitted)).) RD characterized its decision as being based on the fact that Meadow Manor L.P. was an entirely new entity, and, thus, in order to evaluate its ability to satisfy the subsection (a)(4) requirement, RD needed to examine "other housing projects maintained, managed[,] or operated by the same natural persons or business entities" that would manage Barbour Creek on behalf of Meadow Manor. (*Id.* at 10.) Those persons, RD said, would be "Huff Management and members of the Huff family"; indeed, RD believed that Huff and all of the various companies affiliated with the Huff family were "one and the same" (*id.* at 7, 10 (footnote omitted)). Accordingly, in RD's view, the alleged past maintenance and management failures by Huff had to be—and had been—considered when it determined Meadow Manor's eligibility for subsection (a)(4) purposes, and the Hearing Officer had failed to recognize that RD had,

in fact, denied the transfer because Meadow Manor could not maintain, manage, and operate Barbour Creek as required, based on Huff's association with Meadow Manor and the deficiencies that RD had observed with respect to Huff's other properties. (*See id.* at 10–11.)

In his opinion upholding the Hearing Officer's decision, the NAD Director rejects this analysis. First of all, the Director points out, RD had clearly referenced subsection (a)(4) as part of its analysis in the June 24th letter, and far from ignoring this critical aspect of RD's decision, the Hearing Officer had "paraphrase[d]" RD's reasons in this regard—and in so doing, *had* addressed RD's arguments regarding Meadow Manor's inability to satisfy subsection (a)(4). (Director Determination at 7.) Moreover, the Director finds, the Hearing Officer's decision (including his rejection of RD's subsection (a)(4) analysis) was "supported by substantial evidence." (*Id.*) The Director also notes that RD had raised a "host of other arguments" to "support . . . the proposition that its action was correct" (*id.*); *see also* 7 C.F.R. § 11.9(d)(1) (authorizing the Director to consider any and all arguments made to him in his review), none of which he deems sufficient to overturn the Hearing Officer's conclusion. Thus, the Director rejects as "lacking in merit" RD's contention that the Hearing Officer erred in concluding that RD's eligibility determination was incorrect. (Director Determination at 7).

As relevant here, the Director then proceeds to consider and reject certain specific challenges that RD made to the Hearing Officer's determinations regarding Huff's percentage of ownership in Meadow Manor (*see id.* at 7–8), as well as RD's contention that the Hearing Officer was wrong to conclude that, as the applicant,

Meadow Manor (and not Huff) should have been the target of RD's eligibility analysis (*see id.* at 7). The Director also agrees that the additional eligibility requirements of subsection (b)(1) are inapplicable due to Huff's ownership percentage (*see id.* at 7–8), and in the end, the Director sums up his conclusions regarding RD's myriad attacks on the Hearing Officer's determination this way:

> Based on the foregoing discussion, I uphold the [Hearing Officer's] determination that RD erred when it determined that Meadow Manor is not an eligible borrower and that the transfer is not in the best interest of the United States Government. Accordingly, RD may not deny [the] application on those bases.

(*Id.* at 11.)

RD requested that the Director reconsider his decision on April 19, 2016. (*See* Reconsideration Denial at 35.) Significantly (at least to Defendant), RD asserted as part of the reconsideration request that the Director's determination should be withdrawn because it was "tantamount to an eligibility determination." (*Id.* at 36.) Not so, the Director replies in his reconsideration decision, which issued on April 21, 2016; the Director's decision had simply "upheld the [Hearing Officer's] determination that RD did not correctly apply its rules to the facts of the situation" it faced, and nothing in the Director's decision "foreclose[d] RD from appropriately applying its regulations . . . and making whatever decision on [the] application is consistent with the regulations." (*Id.*) Put another way, the Director explains, while RD's contention that a Hearing Officer "may not substitute his or her judgment for that of an agency decision maker unless the agency decision lacks substance" was correct, the determination upholding the Hearing Officer's conclusion would not be revisited because, "in this case[,] the agency decision lacks substance." (*Id.*)

4. <u>RD's "Implementation" Of The NAD Decision</u>

On May 4, 2016, RD wrote a letter to Meadow Manor in which it stated that RD "ha[d] implemented the Final Determination of the National Appeals Division (NAD) dated April 11, 2016[,]" and was writing to "report[] the outcome of our implementation."  (Implementation at 2.)  After briefly recounting the scope of the NAD's authority (as RD understood it) and the circumstances of the submission of the transfer application at issue, RD's implementation decision letter purports to rescind the agency's prior decisions denying the transfer application.  (*See id.* ("In the Final Determination, the NAD found that the Adverse Decisions were erroneous.  We hereby rescind the Adverse Decisions." (footnote omitted)).)[10]  The implementation letter then explains that "[i]n order to implement the Final Determination, we performed another review of the Transfer Application, with consideration given to the additional or new materials you submitted in or around April 2016[,]" and states that "[a]fter careful consideration, the Transfer Application is denied because the Transferee, Meadow Manor, is ineligible."  (*Id.* at 3 (footnote omitted).)

Significantly for present purposes, in the ensuing discussion of RD's reasons for reaching the conclusion that Meadow Manor is not eligible to receive the transfer under applicable regulations, RD points to subsection (a)(4) and explains that, because Meadow Manor is a new entity, RD has to examine who would assist Meadow Manor "in carrying out its affairs" in order to evaluate whether or not Meadow Manor will be able to maintain, manage and operate Barbour Creek.  (Implementation at 3 (footnote omitted); *see also id.* (stating that "[w]e must consider whether Transferees, who will

---

[10] RD listed three prior "Adverse Decisions" dated December 16, 2014; March 4, 2015; and June 24, 2015, each of which is noted above in Part I.C.

become borrowers as a result of the transfer, have experience in successfully operating rental housing in accordance with RD requirements[,]" and that "[w]hen a Transferee does not have any affordable housing experience, we must consider the experience of those who will assist the Transferee" (footnotes omitted)).)  Given this purported duty, RD then proceeds to explain that, in the agency's view, Meadow Manor has an "Identity-of-Interest . . . relationship" with Huff and Huff Management (*id.* at 4), which, RD says, makes Huff's history regarding the maintenance and management of other Section 515 properties relevant to RD's consideration of Meadow Manor's transfer application (*see id.* at 4–5).  Specifically, RD notes that "the Transfer Application states that Meadow Manor has no experience in multi-family housing[,]" and also that "Huff Management would be the management company for Meadow Manor."  (*Id.* at 5 (footnotes omitted).)  And, admittedly using more words and more footnotes than in its June 24th decision letter, RD restates its conclusion that, because "Huff Management is the management agent for 24 properties in Alabama, Georgia, Louisiana and Tennessee that are not in compliance with all RD requirements because the reserve account for each property is underfunded" (*id.* at 6 (footnotes omitted)), Meadow Manor must be deemed "ineligible[,]" and "therefore, the Transfer Application is denied on that ground" (*id.* at 5 (footnote omitted)).

### B.     In Readopting Justifications That The NAD Had Already Rejected, RD Has Failed To Implement The NAD's Final Determination

Having carefully reviewed RD's denial decisions and the determinations of the NAD at both the Hearing Officer and Director levels, this Court confidently concludes that RD has flagrantly flouted the NAD's rulings by basing its "implementation" denial on precisely the same subsection (a)(4) arguments that animated the agency's June 24th

letter—arguments that the NAD squarely rejected. As explained, the thrust of the Hearing Officer's rejection of RD's June 24th rationale was that RD had erred when it evaluated the eligibility of Meadow Manor (the applicant or transferee) based on the purported deficiencies of BCA Ltd, Huff, and/or Huff Management. (Hearing Officer Determination at 6 (explaining that "[t]he appropriate analysis is that of *Meadow Manor, L.P.'s* eligibility" and that "any analysis regarding John T. Huff, Jr., as a limited partner is irrelevant" (emphasis added)).) Furthermore, in finding that the Hearing Officer's conclusions were "supported by substantial evidence" (Director Determination at 7), and in carrying out his responsibility to inquire whether RD's denial determination was "consistent with the laws and regulations of the agency," 7 C.F.R. § 11.10(b), the Director emphatically rejected the link that RD had repeatedly drawn between Meadow Manor's ability to maintain, manage, and operate Barbour Creek and Huff's purported problems in keeping the reserve accounts related to his other properties fully funded (*see* Director Determination at 7).

This means that RD had failed to convince the NAD that Meadow Manor should be deemed ineligible due to Huff's alleged deficiencies in managing other properties under the applicable regulations during the administrative-appeal process, and when the NAD Director refused to reconsider his final decision affirming the Hearing Officer's opinion, RD was required to *implement* the NAD's findings and conclusions with respect to its subsequent review. *See* 7 U.S.C. § 7000. RD did no such thing, as the following statement from the "implementation" letter, which summarizes RD's eligibility conclusions, plainly demonstrates:

> We find that Meadow Manor does not have any housing experience. Therefore, we must consider the experience of those who will assist the

Transferee. You own or control several non-compliant housing projects in multiple States. You, either directly or indirectly, through Huff Management, will assist the Transferee by maintaining, managing and operating Meadow Manor. We find that you, either directly or indirectly, through Huff Management, have demonstrated an *inability* to successfully operate housing projects by failing to perform these functions in accordance with RD requirements. For example, you have failed to maintain multiple reserve accounts at their required funding levels. The fact that these reserve accounts are not funded at the required levels constitutes non-monetary default and is evidence of a violation of the loan agreements. We cannot reasonably conclude that Meadow Manor, under your control, directly or indirectly, through Huff Management, would be maintained, managed and operated in accordance with all Agency requirements. Therefore, Meadow Manor is an ineligible Transferee and the Transfer Application is denied on that ground.

(Implementation at 5 (emphasis in original) (footnotes omitted).) This analysis of Meadow Manor's ineligibility is substantively indistinguishable from the rationale that RD previously adopted as the basis for its denial of the transfer application, and the NAD expressly considered and rejected that reasoning, finding it inconsistent with the applicable regulations. And although RD might agree to disagree with the NAD on the merits of that decision, what it cannot do is simply restate the rejected analysis and also claim to have "implemented" the NAD's decision in any meaningful sense.

Undaunted, RD suggests in its cross-motion for summary judgment that this dispute turns on the meaning of "implementation." (*See* Def.'s Reply in Supp. of Def.'s Cross-Mot. ("Def.'s Reply"), ECF No. 116, at 14 (asserting, in response to Plaintiffs' argument that RD's decision does not implement the NAD's decision, that "there is *no* standard form for an implementation decision" (emphasis in original)).) Perhaps the precise definition of "implementation" matters at the margins of the universe of cases in which the NAD finds agency error, but if "implementation" means anything, then it *must* mean that, when the NAD expressly rejects the agency's rationale for a challenged

action and sends the matter back for the agency to act correctly, the agency has to act *consistently* with what the NAD decided. To do otherwise is a plain violation of the agency's duty to refrain from engaging in arbitrary-and-capricious decisionmaking. *See Judulang*, 132 S. Ct. at 483–84 (directing courts to invalidate "clear error[s] of judgment" (internal quotation marks and citation omitted)).[11]

RD offers only one other defense that warrants further examination. RD acknowledges, as it must, that its June 24th decision "denied the application based, in part, on [RD's] determination that" Meadow Manor could not satisfy subsection (a)(4)'s requirements. (Def.'s Mem. at 9.) But it boldly asserts here that the June 24th denial was *really* based on RD's application of subsection (b)(1) to the facts of the transfer application at issue, and it was only *that* error that the NAD was addressing when it found the June 24th determination to be erroneous. (*See, e.g.*, Def.'s Mem. at 16.) RD's representations patently misrepresent the record, and as such, are entirely unpersuasive.

To begin with, there is no question that the analysis in the June 24th letter is primarily based on RD's determination that Meadow Manor would be unable "to maintain, manage, and operate the housing in accordance with all Agency requirements" for the purpose of subsection (a)(4) (June 24 Denial at 3); indeed, as explained above, the largest of the agency's three sections of analysis is titled as much, and also independently canvasses the reasons Meadow Manor fails subsection (a)(4)

---

[11] For the same reasons, the Director's statement that he had made no eligibility determination and that RD could "appropriately apply[]" its regulations during implementation (Reconsideration Denial at 36) was not a green light to take the same action again, as RD suggests. Whatever the Director meant about the agency's residual authority, it could not possibly mean that RD was permitted to reissue a decision the Director had found to be *inconsistent* with the regulations.

(*see id.* at 3–6).  True, that section references Huff's purported interest in Meadow

Manor.  But the letter (and RD's arguments to the NAD) make quite clear that the

interest is relevant in that section only to show the *fact* of Huff's linkage to Meadow

Manor as support for linkage-based conclusion, not to trigger subsection (b)(1), which

is not even referenced in that part of the analysis.  (*See id.*; *see also* Agency's Pre-Hr'g

Mem. ("RD's Hearing Officer Brief"), Ex. 1 to Def.'s Notice, ECF No. 117-1, at 5.)

Given this, RD does not—and cannot—convincingly explain its current insistence that

the June 24th denial decision rested solely on its application of the subsection (b)(1)

requirements, and thus, that the NAD's decision only prohibited a subsequent section

(b)(1)-type analysis.  (*See* Def.'s Mem. at 9 (asserting that the NAD only assessed "the

specific regulatory basis that RD relied upon in making its determination" (emphasis

omitted)); Def.'s Reply at 15–16 ("[T]he NAD Decisions focused on evaluating what

regulations or procedures RD relied upon (*i.e.*, 7 C.F.R. § 3560.55(b)(1)) that ultimately

led it to determining that it should evaluate the regulatory compliance of the

properties." (emphasis omitted) (citation omitted)).)

Second, and perhaps even more important, it appears that RD characterized its

June 24th denial analysis in *exactly the opposite* terms when it presented its arguments

to the NAD Director; that is, whereas RD now says that its June 24th letter was based

on an analysis of the facts and circumstances of the transfer application under

subsection (b)(1), the NAD Director indicated that, in appearances before *that* tribunal,

RD emphasized that the June 24th denial decision relies on subsection (a)(4) and

asserted that the Hearing Officer had erred precisely because (in RD's view) the

Hearing Officer had treated RD's decision as if it only rested on subsection (b)(1).  (*See*

Director Determination at 7.) RD cannot have it both ways: either its June 24th decision was *not* really about Meadow Manor's inability to maintain, manage, and operate Barbour Creek because of Huff's past failures (as RD insists now) or it *was*. Today, it prefers the former, but at every stage of the NAD process it vehemently defended its denial decision on the basis of its subsection (a)(4) reasoning (*see* RD's Hearing Officer Brief at 4–5; Agency Request for Director Review at 7–8, 10–15), and the NAD Director understood and rejected these arguments.

The bottom line is this: although RD struggles valiantly to convince this Court otherwise, the NAD's decision simply cannot be read as being limited to RD's erroneous application of subsection (b)(1) such that RD's "maintain, manage, and operate" analysis was fair game to be repeated upon implementation in service of the same point. And, make no mistake, the *same* subsection (a)(4) point that RD had made in the June 24th letter was unquestionably served up again during implementation, which was RD's contention that because Huff was connected with Meadow Manor, either directly (as a Limited Partner and 95% owner) or indirectly (via Huff Management), the fact that he was involved with other deficient properties meant that Meadow Manor could not be trusted to maintain, manage, and operate the housing successfully. This means that, somehow, after RD issued a decision declaring that Meadow Manor could not satisfy subsection (a)(4) because it was too closely linked to Huff and Huff Management's alleged failures, and after it pressed that reasoning at every level of the NAD process to no avail, RD relied on that same justification to deny the transfer application yet again in its implementation decision. This Court concludes that, in so doing, RD not only eschewed sane (rational) "implementation" of the NAD's

determination, but its implementation decision was arbitrary and capricious in violation

of the APA. *See Judulang*, 132 S. Ct. at 483–84; *Sykes v. United States*, 564 U.S. 1, 28

(2011) (Scalia, J., dissenting) ("Insanity, it has been said, is doing the same thing over

and over again, but expecting different results.").

> **C.    Because The Agency Has Twice Reviewed The Transfer Application
> And Denied It Both Times On the Same Impermissible Grounds,
> There Is Now Only One Rational Course For The Agency To Follow**

This Court now turns to consider the remedy. It is axiomatic that "once a district

court has determined that an agency made an error, the district court must generally

remand the matter to the agency for further action." *Berge v. United States*, 949 F.

Supp. 2d 36, 42 (D.D.C. 2013) (internal quotation marks and citation omitted); *see also*

*Palisades*, 426 F.3d at 403. This course is generally warranted because courts prefer

that agencies apply their expertise to pertinent issues of fact and law in the first

instance. *See Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 30 (D.D.C. 2014).

But it is also well established that this principle does not apply when "there is 'only one

rational course' for the Agency to follow upon remand." *Berge*, 949 F. Supp. 2d at 43

(quoting *Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Labor Relations Auth.*, 778 F.2d

850, 862 n.19 (D.C. Cir. 1985)). In the relatively unusual circumstance where "'the

outcome of a new administrative proceeding is preordained,' a district court may forego

the futile gesture of remand to the agency." *Id.* (quoting *A.L. Pharma, Inc. v. Shalala*,

62 F.3d 1484, 1489 (D.C. Cir. 1995)).

In this Court's considered judgment, this is such a case. To understand why the

Court has reached this conclusion, recall that the implementation dispute harkens back

to RD's contention in its June 24th denial letter that Meadow Manor failed to satisfy the

eligibility criteria in subsection (a)(4) because this new entity was connected to Huff

and Huff Management, which had numerous deficiencies in regard other Huff properties. The NAD Director concluded, in effect, that RD's eligibility analysis was not "consistent with the laws and regulations of the agency, and with the generally applicable interpretations of such laws and regulations[,]" 7 C.F.R. § 11.10(b), and RD's obligation upon implementation was to "fully and promptly . . . effectuate" that Director determination, *id.* § 11.1. Importantly, to accomplish this mission, RD asserts that it "*performed another review of the Transfer Application*" and gave it "*careful consideration*" (Implementation at 3 (emphasis added)); indeed, the agency avers that individuals from the National Office conducted the implementation review after the Director's determination (*see* Def.'s Mem. at 15 n.1). And the record supports this representation: in contrast to the June 24th correspondence, the head of the entire subdepartment—the Administrator of the Rural Housing Service—signed the implementation letter. (*See* Implementation at 2, 8.)

Per the general practice of federal courts, this Court must presume that the individual employees who performed the implementation review undertook their duties in good faith. *See CTIA–The Wireless Ass'n v. FCC*, 530 F.3d 984, 989 (D.C. 2008). What that means in this context is that the *only* defect that was identified as warranting denial of the instant application was the link-to-Huff deficiency that the NAD had already rejected as a basis for denying the transfer, even when the agency employed fresh eyes and independent expertise. In other words, when this Court credits the agency's representation that the transfer application was given "careful consideration" during the implementation process (as it must), then it is entirely reasonable to infer, based on the agency's own evaluation of the application at issue, *that no other reasons*

*for denial exist*, and therefore, in lieu of remanding the case for the agency to perform its only permissible task (grant the transfer), that "the best course is for [this Court] to simply apply [that] obvious result." *Am. Fed. of Gov't Emps.*, 778 F.2d at 862 n.19; *see, e.g.*, *Union Pac. R.R. Co. v. U.S. Dep't of Homeland Sec.*, 738 F.3d 885, 901–02 (8th Cir. 2013) (declining to remand to the agency when "'only one conclusion would be supportable.'" (quoting *Donovan v. Stafford Constr. Co.*, 732 F.2d 954, 961 (D.C. Cir. 1984))); *Fogg v. Ashcroft*, 254 F.3d 103, 111–12 (D.C. Cir. 2001) (same principle); *see also Dantran, Inc. v. U.S. Dep't of Labor*, 171 F.3d 58, 75 (1st Cir. 1999) ("Courts should not indulge in wasteful wheel-spinning."); Merrick B. Garland, *Deregulation and Judicial Review*, 98 Harv. L. Rev. 505, 570–71 (1985) (explaining that, where there is only one possible answer, "vacating and remanding would be not a logical response to agency failure, but an invitation to an endless charade—a kind of absurdist theater in which the court sends the agency back to try again each time the agency reaches a[n improper] result" (footnote omitted)).

This course of action is especially sensible here. The Reorganization Act that created the NAD aimed "to achieve greater efficiency, effectiveness, and economies in the organization and management" of the USDA's activities. 7 U.S.C. § 6901. RD's failure to implement, standing alone, constitutes a significant inefficiency that has drained the time of the agency, the regulated parties, and the Court. And it does not stand alone. The Court briefly mentioned the convoluted history of this case at the outset (*see supra* Part I.C), and it has been tortuous to say the least. Huff has been seeking RD's approval of this transfer since July of 2014. (*See* Compl. ¶ 68; Letter of April 28, 2015, Ex. D to Def.'s Notice, ECF No. 20-4, at 6.) RD originally issued a

letter decision denying that request in December 2014; then, upon Huff's request for reconsideration, reaffirmed its decision via a second letter in March of 2015. (*See* March 4 Denial Letter at 2–3.) Huff appealed that decision and received a NAD hearing set for May 27, 2015. (*See* NAD Notice of Cancellation of Hearing at 2.) That hearing never occurred, however, because the agency informed him eight days prior that it was withdrawing the prior denial letters because it had accidentally violated internal procedures in issuing them. (*See* Letter Notifying Hearing Officer of Voluntary Withdrawal at 3.) That sent Huff back to the starting blocks to try again, and the denial letter of June 24, 2015, which has been discussed exhaustively in this opinion, followed.[12] In a very real sense, then, RD has had not two, but *four* opportunities to render a correct decision with respect to the transfer application. And now, after all that, RD has issued an implementation decision that, insofar as it rehashes the same analysis that the NAD considered and rejected as explained above, is once again contrary to law. *See* 7 U.S.C. § 7000.

Plaintiffs have consistently represented to this Court that time is of the essence. (*See, e.g.*, Pls.' Mem. at 32 (claiming that the current state of events is leading to "imminent and irreparable harm").) But even if this case does not warrant Plaintiffs' fervent calls for urgent intervention (*see* Def.'s Mem. at 27 (disputing this contention)), no regulated party should be trapped in a hamster wheel of perpetual administrative process. At some point, an agency's review of Huff's transfer application *has* to finish,

---

[12] On the subject of delay, while not directly attributable to RD itself, this case was further delayed when the government requested that it be transferred and the Court granted that request (over Plaintiffs' objection). (*See* Mem. Op. & Order, ECF No. 17.) Two months elapsed while this case languished on the docket of the Middle District of Alabama, which, incidentally was in the throes of a judicial emergency, and ultimately sent the case back to this jurisdiction with both parties' consent. (*See generally* Consent Mot., ECF No. 45; Order, ECF No. 47.)

and it is high time for the instant dispute, too, to come to an end. This saga has gone on long enough; this Court hereby finds that RD has erred (yet again) with respect to its implementation of the NAD's remand order, and as explained, given the procedural history of this matter, there is "'only one rational course' for the Agency to follow" now. *Berge*, 949 F. Supp. 2d at 43 (quoting *Am. Fed'n of Gov't Emps.*, 778 F.2d at 862 n.19). What is more, the only remaining rational course of action is one that this Court is statutorily authorized to order under the circumstances presented here. *See* 5 U.S.C. § 706(1) (permitting district courts to "compel agency action unlawfully withheld or unreasonably delayed"); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (explaining that, under 5 U.S.C. § 706(1) of the APA, a court may order an agency to perform a "discrete agency action" that the agency "is required to take" (emphasis omitted)). In the Order that follows this Court invokes that authority.

## IV.    ORDER

Because RD committed clear error in violation of the APA when it relied on the same legal and factual reasons for denying plaintiffs' transfer application that the NAD had already rejected while purporting to "implement" the NAD's final determination, and also due to the lengthy history of this dispute and the fact that there is only one rational course remaining, it is hereby

**ORDERED** that Plaintiffs' [102] emergency motion for summary judgment with respect to the Barbour Creek transfer claim is **GRANTED**, and Defendant's [108] cross-motion is **DENIED**.  It is

**FURTHER ORDERED** that RD shall approve Plaintiffs' transfer application within thirty days of the date of this Order.


DATE:  July 5, 2016                                    *Ketanji Brown Jackson*
                                                       KETANJI BROWN JACKSON
                                                       United States District Judge

# APPENDIX

7 C.F.R. § 3560.55

Applicant eligibility requirements.

Applicants for off-farm labor housing loans and grants should also refer to § 3560.555, and applicants for on-farm labor housing loans should refer to § 3560.605.

**(a) General.** To be eligible for Agency assistance, applicants must meet the following requirements:

(1) Be a U.S. citizen or qualified alien(s); a corporation; a state or local public Agency; an Indian tribe as defined in § 3560.11; or a limited liability company (LLC), nonprofit organization, consumer cooperative, trust, partnership, or limited partnership in which the principals are U.S. citizens or qualified aliens;

(2) Be unable to obtain similar credit elsewhere at rates that would allow for rents within the payment ability of eligible residents;

(3) Possess the legal and financial capacity to carry out the obligations required for the loan or grant;

(4) Be able to maintain, manage, and operate the housing for its intended purpose and in accordance with all Agency requirements;

(5) With the exception of applicants who are a nonprofit organization, housing cooperative or public body, be able to provide the borrower contribution from their own resources (this contribution must be in the form of cash, or land, or a combination thereof);

(6) Have or be able to obtain a minimum of 2 percent of the total development costs for use as initial operating capital (for nonprofit organizations, cooperatives, or public bodies, this amount may be financed through Agency funds); and

(7) Not be suspended, debarred, or excluded based on the "List of Parties Excluded from Federal Procurement and Nonprocurement Programs." The list is available to Federal agencies from the U.S. Government Printing Office. Non-federal parties should contact the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402, (202) 512–1800.

(8) Not delinquent on Federal debt or a Federal judgment debtor, with the exception of those debtors described in § 3560.55(b).

**(b) Additional requirement for applicants with prior debt.** If an applicant or the managing general partner of a borrower, as well as any affiliated entity having a 10 percent or more ownership interest, has a prior or existing Agency debt, the following additional requirements must be met.

(1) The applicant must be in compliance with any existing loan or grant agreements and with all legal and regulatory requirements or must have an

Agency-approved workout agreement and be in compliance with the provisions of the workout agreement. The Agency may require that applicants with monetary or non-monetary deficiencies be in compliance with an Agency-approved workout agreement for a minimum of 6 consecutive months before becoming eligible for further assistance.

(2) The applicant must be in compliance with the Title VI of the Civil Rights Act of 1964, section 504 of the Rehabilitation Act of 1973, and all other applicable civil rights laws.

**(c) Additional requirements for nonprofit organizations.** In addition to the eligibility requirements of paragraphs (a) and (b) of this section, nonprofit organizations must meet the following criteria:

(1) The applicant must have received a tax-exempt ruling from the IRS designating the applicant as a 501(c)(3) or 501(c)(4) organization.

(2) The applicant must have in its charter the provision of affordable housing.

(3) No part of the applicant's earnings may benefit any of its members, founders, or contributors.

(4) The applicant must be legally organized under state and local law.

(5) In the case of off-farm labor housing loans and grants, nonprofit organizations must be "broad-based" nonprofit organizations (refer to § 3560.555(a)(1)).

**(d) Additional requirements for limited partnerships.** In addition to the applicant eligibility requirements of paragraphs (a) and (b) of this section, limited partnership loan applicants must meet the following criteria:

(1) The general partners must be able to meet the borrower contribution requirements if the partnership is not able to do so at the time of loan request.

(2) The general partners must maintain a minimum 5 percent financial interest in the residuals or refinancing proceeds in accordance with the partnership organizational documents.

(3) The partnership must agree that new general partners can be brought into the organization only with the prior written consent of the Agency.

**(e) Additional requirements for Limited Liability Companies (LLCs).** In addition to the applicant eligibility requirements of paragraphs (a) and (b) of this section, LLC loan applicants must meet the following criteria:

(1) One member who holds at least a 5 percent financial interest in the LLC must be designated the authorized agent to act on the LLC's behalf to bind the LLC and carry out the management functions of the LLC.

(2) No new members may be brought into the organization without prior consent of the Agency.

(3) The members must commit to meet the equity contribution requirements if the LLC is not able to do so at the time of loan request.